# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 3, 2016

Lyle W. Cayce
Clerk

No. 15-20080

ERONY PRATT, Individually and as Representative of the Estate of Wayne Pratt, Deceased,

>            Plaintiff - Appellant

v.

HARRIS COUNTY, TEXAS; ADRIAN GARCIA, Harris County Sheriff; MICHAEL MEDINA, Deputy; VINCENT LOPEZ, Deputy; TARZIS LOBOS, Deputy; BRIAN GOLDSTIEN, Deputy; TOMMY WILKS, JR., Deputy; FRANCISCO SALAZAR, Deputy; B. J. AUZENE, Deputy; R. DEALEJANDRO, JR., Deputy; R. M. GOERLITZ, Deputy; E. M. JONES, Sergeant; M. COKER, Sergeant,

>            Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HAYNES, and COSTA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Erony Pratt, the mother of the deceased, filed this 42 U.S.C. § 1983 lawsuit alleging that officers of the Harris County Sheriff's Department ("HCSD"), in Harris County, Texas, caused her son's death by using excessive force in restraining him during his arrest. Furthermore, she asserted, under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), that Harris County was also liable for his death. The district court granted

No. 15-20080

qualified immunity to HCSD officers in their individual capacity and denied Pratt's claims under *Monell.* Pratt appealed. Finding no error, we AFFIRM.

## I.

## A.

In reviewing an appeal from summary judgment, we "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *See Deville v. Marcantel,* 567 F.3d 156, 163-64 (5th Cir. 2009). The majority of the facts in this opinion, therefore, are adopted from the appellant's briefing before this Court.

Wayne Pratt ("Pratt") was involved in a minor traffic accident. In response to a disturbance call, HCSD Deputy Vincent Lopez, upon arrival at the scene, observed a vehicle with front-end damage resting in a ditch and Pratt "running in circles . . . imitating a boxer."[1] HCSD Deputies Brian Goldstein and Michael Medina arrived shortly. All three officers attempted to interact with Pratt. Pratt did not respond, but began to walk away. All three officers requested that he stop walking away. Pratt still did not respond, and remained in an uncooperative state.

After several warnings, Pratt began approaching Lopez and came within 5-7 feet of Lopez. Lopez then unholstered his taser and commanded Pratt to stop. At this point, Goldstein and Medina unholstered their tasers as well and Pratt began to run away. Lopez deployed his taser, but was ineffective in stopping Pratt.[2] Lopez cycled his taser two more times in the next forty

---

[1] Officer Lopez also testified that Pratt "appeared to be intoxicated, and his behavior was erratic." There is no evidence in the record, however, that Officer Lopez relayed this information to any other officer upon their arrival at the scene.

[2] The HCSD's tasers typically discharge two probes. If both probes attach to an arrestee's skin, then the arrestee's body completes the path between the two probes. A predetermined voltage is then applied by the taser and an electrical current flows through the arrestee's body. Feeling the effects of the electrical current flowing through his body, the arrestee is typically incapacitated. If, however, only one probe connects to the arrestee upon

2

seconds, which also failed to stop Pratt. Around this time, deputies Tommy Wilks, Tarzis Lobos, Francisco Salazar, B. J. Auzene, R. DeAlejandro, and R. M. Goerlitz arrived at the scene.

Because Lopez's efforts to subdue Pratt were ineffective, Medina deployed his taser. Pratt fell to the ground. Goldstein attempted to handcuff Pratt but, because of Pratt's continued resistance, he was able to secure only one of Pratt's arms in a handcuff. Medina cycled his taser two more times in the next thirty seconds. Pratt continued to struggle. When Lobos began aiding Goldstein in handcuffing Pratt, however, he stopped resisting and said "okay, okay, I'll quit. . . . I'll stop fighting." Goldstein then secured both of Pratt's arms in handcuffs. Pratt was patted down for weapons. None were found.

After Pratt was in handcuffs, Salazar aided Goldstein in lifting Pratt and walking him toward the patrol car. After a few steps, however, Pratt again began to resist and broke free from Goldstein's grip. Salazar returned Pratt to the ground. While on the ground, Pratt began kicking at Goldstein and Salazar. Pratt kicked Goldstein in the groin twice during the exchange. Witnessing this exchange, Wilks retrieved a hobble restraint (i.e., handcuffs that attach to an arrestee's ankles) from his patrol car.

As Pratt continued to struggle, Salazar, Lobos, and Medina attempted to aid Goldstein in controlling him. During this struggle Medina tasered Pratt once again, this time in "drive stun mode" (in which the taser leads make direct contact with the arrestee's body), and Goldstein was able to gain control of Pratt's legs. Goldstein then rolled Pratt onto his stomach, crossed Pratt's legs, and bent them towards his buttocks. Salazar also placed his knee on Pratt's back in order to maintain compliance. When Wilks returned with the hobble

_____

deployment, and the other probe, for instance, falls to the ground, then the circuit is not complete, and almost no current flows through the arrestee's body.

3

restraint, Goldstein aided him in attaching it to Pratt's legs. Pratt ceased resisting and said "Ok I quit. I'm done." Goldstein and Salazar also ceased physically restraining him. At this point, Pratt's handcuffs were connected to the hobble restraint behind his back. Pratt was "hog-tied".

Shortly, EMS arrived at the scene.[3] EMS paramedics requested that the hobble restraint and handcuffs be removed so CPR could be administered. Pratt did not have a pulse and had ceased breathing. Upon treatment, Pratt regained a pulse, but did not resume independent breathing until after arriving at the hospital. Pratt died the following morning.

Following his death Dr. Darshan Phantak conducted Pratt's autopsy and concluded that "[t]he cause and manner of the death . . . [wa]s best classified as 'UNDETERMINED'". Dr. Phantak based this conclusion on the fact that he could not "definitively separate[]" the effect of Pratt's ingestion of cocaine and ethanol, from the other possible contributing factors—which, at least, included Pratt's car accident, various altercations, tasing, and hog-tying—that culminated in his asphyxiation.

Dr. Lee Ann Grossberg, Pratt's expert witness, also submitted an affidavit to the district court, which differed from the findings of Dr. Phantak. Specifically, rather than leaving the cause of death undetermined, Dr. Grossberg described the cause of death as "multi-factorial" and "list[ed] the factors that contributed to the death." In Dr. Grossberg's opinion, "the cause of death . . . [wa]s due to the combined effects of prone restraint and cocaine

---

[3] The exact duration of Pratt's restraint has not been alleged by either party. The taser log indicates that Pratt's last tasing (which took place immediately before he was hog-tied) occurred at 20:27:18. The paramedics began treating Pratt at approximately "20:27." Although these timelines seem inconsistent, it is important that the timeline established by the taser log was automated, while the timeline established by Paramedic William Slagle's testimony was entered manually sometime after the incident, and "[s]ome of the [times entered] [we]re rough guesstimates . . . about when each event took place." Nevertheless, it appears that Pratt was restrained for a very brief period.

and ethanol toxicity" and "[c]ontributing factors also include[d] TASER use, dilated/hypertrophic cardiomyopathy, obesity and chronic drug use." Dr. Grossberg further concluded that Pratt's death was "complex and multi-factorial" and that "no single factor is 100% responsible"; rather, it was "the combination of events and factors in a susceptible individual that cause[d] the 'perfect storm' . . . [that] result[ed] in the death."

At the time of Pratt's arrest, the HCSD had a policy that prohibited officers from using hog-tie restraints, prompting the HCSD to conduct an "In Custody Death Review" of Pratt's death. The results were presented to a grand jury, and Goldstein, Medina, and Lopez were no-billed by the grand jury. A second internal investigation was conducted, reviewing specifically the use of the "hog-tying" restraint by Goldstein and Wilks. The Administrative Disciplinary committee found Goldstein and Wilks's alleged misconduct "not sustained."

## B.

As earlier indicated, Erony Pratt, individually and as representative of Pratt's estate, brought this § 1983 cause of action alleging various violations of Pratt's Fourth Amendment rights against individual officers and Harris County. The HCSD officers moved for summary judgment, asserting defenses of qualified immunity. Harris County also moved for summary judgment contending that Pratt failed to sufficiently plead *Monell* liability as a matter of law. On summary judgment, the district court granted qualified immunity to the HCSD officers, denied Pratt's *Monell* claims against Harris County, and dismissed the complaint. *Pratt v. Harris Cnty., Tex.*, No. H-12-1770, 2015 WL 224945 (S.D. Tex. Jan. 15, 2015).

On appeal, Pratt challenges the district court's grant of qualified immunity, contending unconstitutional conduct by HCSD officers as follows: 1) Deputies Lopez and Medina's excessive use of force by tasing Pratt;

No. 15-20080

2) Deputies Wilks, Goldstein, and Salazar's excessive use of force by hog-tying Pratt; 3) Deputies Auzenne, DeAlejandro, Goerlitz, and Lobos's failure to assist Pratt during either allegedly excessive use of force; and 4) Sergeants M. Coker and E. M. Jones, and Sheriff Adrian Garcia's failure to train and/or supervise the nine deputies present at the scene of Pratt's arrest.  Furthermore, Pratt maintains that Harris County is liable under *Monell* for: 1) tasing and hog-tying customs that fairly represented municipal policy; 2) failure to train and/or supervise; and 3) ratification of the unconstitutional conduct of the HCSD officers.

## II.

We review the district court's grant of summary judgment de novo, also applying the same standards as the district court.  *See Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).  Summary judgment is only appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "On a motion for summary judgment, [we] must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009).

To establish a claim under § 1983, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014).  Additionally, "[c]laims under § 1983 may be brought against persons in their individual or official capacity, or against a governmental entity." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

No. 15-20080

A municipality and/or its policymakers may be held liable under § 1983 "when execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . ." *Monell*, 436 U.S. at 694; *see also Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (requiring plaintiffs asserting *Monell*-liability claims to show "(1) an official policy (2) promulgated by the municipal policymaker (3) [that was also] the moving force behind the violation of a constitutional right").

III.

We will first address the § 1983 claims against various HCSD officers. Because the officers were sued in their individual capacity, they asserted qualified immunity defenses. *See Goodman*, 571 F.3d at 395; *see also Pratt*, 2015 WL 224945 at *8. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). We must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison. *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

When evaluating a qualified immunity defense, we conduct a "well-known" two-prong inquiry. *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 490 (5th Cir. 2001). "In order to overcome a qualified immunity defense, a plaintiff must *allege* a violation of a constitutional right, and then must show that 'the right was clearly established . . . in light of the specific context of the case.'" *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (emphasis added) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Furthermore, we "may

7

address these two elements in either order, and need not proceed to the second where the first is resolved in the negative." *Id.* (citations omitted).

We first turn to whether Pratt has shown the violation of a constitutional right.

A.

Pratt argues that HCSD officers violated her son's Fourth Amendment rights of reasonable search and seizure by using excessive force in his arrest. Furthermore, Pratt contends that the HCSD officers' conduct was unconstitutionally excessive, i.e., unreasonable, in two ways: by tasering her son unnecessarily and by hog-tying him.

"When a plaintiff alleges excessive force during an investigation or arrest, the . . . right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Furthermore, determining "whether this right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the *intrusion.*'" *Id.* (emphasis added) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

When a plaintiff alleges a violation of his Fourth Amendment rights due to excessive force, we are presented with a legal question concerning the reasonableness of the officer's conduct, which is embodied in the claim itself. Specifically, to establish a claim of excessive force under the Fourth Amendment, Pratt "must demonstrate: '(1) [an] injury, (2) which resulted directly and only from a use of force that was *clearly excessive*, and (3) the excessiveness of which was clearly *unreasonable.*" *Deville*, 567 F.3d at 167 (emphasis added) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). "Excessive force claims are necessarily fact-intensive." *Id.* Therefore, "whether the force used is 'excessive' or 'unreasonable' depends on 'the facts

and circumstances of each particular case", and we must "consider . . . 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (citing *Graham*, 490 U.S. at 396).

1.

First, Pratt contends that Deputies Lopez and Medina violated her son's Fourth Amendment rights by using excessive use in tasing him unnecessarily. Pratt, however, has not demonstrated by facts, or alleged facts subject to dispute, that the officers used unnecessary or unreasonable force under the circumstances.

Construing the facts in the light most favorable to him, Pratt ignored multiple requests and warnings from both Lopez and Medina. Indeed, Pratt aggressively evaded Lopez and Medina's attempts to apprehend him. Only after he continuously failed to comply, did either deputy deploy tasers; Medina used his taser only after Lopez's efforts to subdue Pratt were ineffective. The evidence showed that Medina cycled his taser only when Pratt continued to resist handcuffing. Once Pratt complied, and Goldstein was able to handcuff him, Medina stopped using his taser. But, when Pratt kicked an officer after being taken to the ground, Medina used his taser again; and, once again, officers were able to control him. It is also important that neither officer used their taser as the *first method* to gain Pratt's compliance. The record shows that both officers responded "with 'measured and ascending' actions that corresponded to [Pratt's] escalating verbal and physical resistance." *See Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (citations omitted).

In sum, Pratt has not shown that Lopez and Medina's use of tasers was "clearly excessive" or "unreasonable." Accordingly, we hold that the district court did not err in granting both Lopez and Medina qualified immunity in this respect.

No. 15-20080

2.

Next, Pratt contends that Deputies Wilks, Goldstein, and Salazar violated her son's Fourth Amendment rights by using excessive force in hog-tying him. Although hog-tying is a controversial restraint, we have never held that an officer's use of a hog-tie restraint is, per se, an unconstitutional use of excessive force. We have, however, previously addressed the excessiveness and reasonableness of the restraint.

In *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998), Gutierrez resisted arrest, was violent towards officers, and was hog-tied (by having his "legs [drawn] backward at a 90–degree angle in an 'L' shape" and connected, behind his back, to his hands). *Id.* at 443. Gutierrez, still resisting, was then placed face down in the back of a patrol car and driven to a hospital for the treatment of injuries sustained during his arrest. *Id.* Upon arrival at the hospital, Gutierrez had stopped breathing. *Id.* Shortly thereafter, he was pronounced dead. *Id.* Against this background we said that "hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances—i.e., when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Id.* at 451. In the context of that case, we found a triable issue in using a hog-tie restraint. Significant to that finding, however, was that Gutierrez had told the arresting officers he was on drugs. *Id.* at 448-49 ("Gutierrez told [Officer] Walters that he had used bad cocaine. . . . Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows that the officers knew that Gutierrez was under the influence of drugs . . . ."). The *Gutierrez* court took particular care to add: "In conclusion, our holding today is very limited." *See id.* at 451.

Over ten years later, this Court again addressed the constitutionality of hog-tie restraints. In *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230 (5th Cir. 2009),

we held that an officer's use of a "four-point restraint"—the more formal term for "hog-tying"—was not a "per se unconstitutionally excessive use of force." *Hill*, 587 F.3d at 235 ("*Gutierrez* does not hold four-point restraint a per se unconstitutionally excessive use of force. . . ."). Like Gutierrez, Loggins resisted arrest, was violent towards officers, and was hog-tied. *Id.* at 232-33. Also, like Gutierrez, Loggins was placed face down in the back of a patrol car while hog-tied and transported for approximately 30 minutes to the nearest hospital. *Id.* at 233. Like Gutierrez, Loggins ceased breathing, and was pronounced dead upon arrival at the hospital. *Id.* Unlike Gutierrez, however, Loggins was not under the influence of drugs or alcohol during her arrest. *Id.* Furthermore, at trial, Loggins's medical expert testified specifically that she "died from positional asphyxia (suffocation)". *Id.*

On appeal, however, we determined that "[t]he exact cause of Loggins's death [wa]s unclear" because although her "body temperature at the time of death was recorded at 107.5°F, an elevation consistent with the official autopsy diagnosis of fatal hyperthermia[,] Loggins was also obese and hypertensive". *Id.* Furthermore, we said that "[w]hile characterizing [hog-tie] restraints as dangerous when applied to a morbidly obese woman . . . [Loggins's expert's] testimony fail[ed] to raise a material fact issue that the use of four-point restraints was objectively unreasonable." *Id.* at 236. Accordingly, we held that "deputies cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force", because "[j]udged from the perspective of an officer at the scene of Loggins's arrest and transportation, as *Graham* . . . requires, the deputies had no objective basis not to use four-point restraints." *Id.* at 237. Consequently, there was no "material fact issue" whether "the deputies' use of four-point restraints was unnecessary, excessively disproportionate to the resistance they faced, or objectively unreasonable in terms of its peril to [the arrestee]". *Id.*

11

No. 15-20080

Since *Hill*, this Court has spoken only once, in *Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012), on the constitutionality of hog-tying. In *Khan* we held that an officer's decision to hog-tie a drug-affected arrestee did not violate a clearly established constitutional right because the restraint was used only briefly and the arresting officers did not know that the arrestee was under the influence of drugs.[4] *See id.* at 195-96.

On appeal, Pratt argues that it is significant that the HCSD had a policy prohibiting the hog-tying of arrestees. Pratt also points out that Officer Wilks, the primary facilitator of Pratt's hog-tying, acknowledged his belief that hog-tying was unconstitutional.[5] Pratt further contends that her son had stopped resisting, at least temporarily, at the time he was hog-tied, but acknowledges that he had to be subdued earlier after "giving up".[6] But, the constitutionality of an officer's actions, is neither guided nor governed by an officer's subjective beliefs about the constitutionality of his actions or by his adherence to the policies of the department under which he operates. *See, e.g., Hernandez v.*

---

[4] Specifically, in *Khan* we held that "Khan's treatment did not violate a clearly established right" because "[u]nlike in *Hill*, Khan was not left face down in the four-point restraint for an extended period of time." *Khan v. Normand*, 683 F.3d 192, 195 (5th Cir. 2012). Moreover, in *Khan* we also held that "the brevity of Khan's restraint and the constant supervision similarly distinguish[ed] [*Khan*] from *Gutierrez*"; and, "*Gutierrez* [also] dealt with officers who knew the decedent had—as he told the officers—'shot some bad coke.' . . . [whereas] [t]he record contain[ed] no similar knowledge by the officers in the field." *Id.* at 195-96.

[5] Wilks Dep. 48:25-49:1-2 ("Q: [Y]ou were aware that [hog-tying Pratt] would not be constitutional. Correct? A: Yes.")

[6] *See* Goldstein Dep. 119:17-21, Jan. 13, 2014 ("When I put the hobble on, he said, okay, I quit. I'm done. Sorry. Whatever. He stopped resisting. He had no resistance whatsoever. So I believe Deputy Salazar had the long end of the hobble. And I just got up."); Wilks Dep. 46:1-11 ("Q: After you hobbled him . . . was he still kicking? A: No. Q: Was he still swinging his legs? A: No. Q: Swinging his arms? A: No, ma'am."); Salazar Incident Rep., May 12, 2010 ("During this time, as Deputy Goldstein and I were attempting to hold the suspect down, Deputy M. Medina . . . dry stunned the suspect, the suspect then became compliant."); *see also* Lobos Aff., at 2 ("Deputy M. Medina moved in and deployed a drive stun to Mr. Pratt's back . . . in an attempt to gain control and compliance. This was effective because Deputy Goldstein was able to take control of Mr. Pratt's legs as he had now stopped resisting.").

12

No. 15-20080

*Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) ("The claim is that the mere failure . . . to follow their [departmental] regulations was a constitutional violation. There is no such controlling constitutional principle."). Instead, we must examine whether the HCSD officers' conduct was excessive or unreasonable under the "circumstances of [this] particular case." *Deville*, 567 F.3d at 167. Considering the record evidence, neither the circumstances surrounding the arrest nor our precedent support that the decision to hog-tie Pratt was an excessive or unreasonable one.

First, as earlier observed, we have never held that hog-tying is a per se unconstitutional technique of controlling a resisting arrestee. Thus, an assertion of hog-tying alone does not constitute a claim of excessive force. Instead, Pratt "must demonstrate: '(1) [an] injury, (2) which resulted directly and only from a use of force that was *clearly excessive*, and (3) the excessiveness of which was clearly *unreasonable*." *Id.* (emphasis added).

Turning to the excessiveness and unreasonableness of Deputies Wilks, Goldstein, and Salazar's conduct, the record evidence shows that Pratt ignored multiple requests and warnings from all three officers; and, he aggressively evaded their attempts to apprehend him, even after promising compliance. Construing the facts in the light most favorable to him, it is clear from the record that Pratt did not follow through on his offers to comply with the officers' requests. Instead, Pratt renewed resistance, broke free from the officers' grips, and kicked at officers attempting to restrain him (eventually kicking one officer in the groin twice). Furthermore, unlike the arrestee in *Gutierrez*, the officers who hog-tied Pratt were unaware of his use of drugs or alcohol when they hog-tied him, and Pratt does not contend that her son volunteered such information. Additionally, unlike the arrestees in *Gutierrez* and *Hill*, neither party contests that Pratt was only restrained for a very brief period. Thus, in

13

No. 15-20080

the factual context of this case, the use of the hog-tie restraint was not unconstitutionally excessive, or unreasonable.

To conclude, in the light of Pratt's "on again, off again" commitment to cease resisting, his recurring violence, and the threat he posed while unrestrained, it was not, under the totality of the circumstances, "clearly excessive" or "unreasonable" for HCSD officers to restrain him as they did. For these reasons, we hold that the district court did not err in granting Wilks, Goldstein, or Salazar qualified immunity.

## IV.

In sum, the record evidence, read in the light most favorable to Pratt, does not show that his Fourth Amendment rights were violated.[7] The district court's judgment is, in all respects

AFFIRMED.

---

[7] The remainder of Pratt's claims—that other deputies failed to intervene on his behalf, that supervisory officers (in their individual capacity) failed to sufficiently train the deputies who participated in Pratt's arrest, and that the County violated his rights by not preventing the tasering dond hog-tying practices—are premised on a violation of his constitutional rights. Because, as discussed above, Pratt cannot show such a violation, we need not address these claims.

No. 15-20080

GREGG COSTA, Circuit Judge, concurring in the judgment:

My colleagues' differing opinions on whether the force applied in this tragic case was excessive demonstrate that the constitutional question is a close call even for a judge who can spend days parsing the fine points of case law, let alone for an officer making split second decisions in the field. It is precisely for such situations—when the existence of a constitutional violation is not "beyond debate"—that qualified immunity provides a defense. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

*Khan v. Normand*, 683 F.3d 192 (5th Cir. 2012), alone supports the application of qualified immunity. That decision assessed the state of "hog-tying" law as of 2007. *Id.* at 193. It thus binds us in assessing the state of that law in 2010 given the absence of any intervening authority. *See Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) ("In concluding that a particular right is clearly established, courts must rely only on authority that existed at the time of the disputed conduct; conversely, courts may consider newer contrary authority as evidence that the asserted right is *not* clearly established." (emphasis in original) (citing *Wilson v. Layne*, 526 U.S. 603, 614, 617–18 (1999))). *Khan* found no violation of clearly established law because the arrestee "was not left face down in the four-point restraint for an extended period of time," he "remained under constant supervision," and the officers had not been told that the arrestee was in a cocaine-induced psychosis. 683 F.3d at 195–96. The same facts exist here.

*Hill v. Carroll County*, 587 F.3d 230 (5th Cir. 2009), provides even stronger support for qualified immunity. It found no constitutional violation—not just the absence of a clearly established violation—when the obese arrestee remained hog-tied and alone in the back seat of a patrol car during a 29 mile drive to jail. 587 F.3d 232–33, 237. In doing so, it emphasized factors that are

15

again present here: the arrestee's continued resistance to the officers and the absence of a cocaine-induced psychosis such as the one the officers knew about in *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998).[1]  *Id.* at 237. With *Hill* on the books when Pratt was restrained for a much briefer time, it is difficult to find that a holding opposite the one in *Hill* would have been clearly established in 2010.

On this ground of qualified immunity, I would affirm the judgment.[2]

---

[1] Recognizing that the officer's actual notice of cocaine use that existed in *Gutierrez* is not present here, Judge Haynes finds that "they had sufficient information to lead them to suspect that he was intoxicated with some kind of unknown substance." Dissent at __. But irrational behavior existed in all our hog-tying cases; that is what led to the use of the restraint in the first place. In *Khan*, for example, the officers thought the arrestee was "suffering from a mental illness," but that was not sufficient to support a finding that they should have suspected cocaine use.  683 F.3d at 196.  And it's not just use of "some kind of unknown substance" that led to the decision in *Gutierrez*, but use of cocaine in particular as one report had found that hog-tying created a substantial risk of death when applied to persons suffering from a cocaine-induced psychosis.  139 F.3d at 451; *but see Hill*, 587 F.3d at 235 (noting that a more recent study had cast doubt on the study relied on in *Gutierrez* and therefore it did not "extend beyond its facts").

[2] Because qualified immunity provides a defense for the deputies involved in the use of force, it also warrants dismissal of the supervisory liability claims.  *See Doe v. Taylor I.S.D.,* 15 F.3d 443, 454 (5th Cir. 1994) (en banc) (explaining that for supervisory liability claims the qualified immunity "clearly established" standard applies to the underlying violation as well as the duty to provide better supervision concerning that right).  And I agree with Judge Haynes that any constitutional violation is not attributable to the County as its policy prohibits hog-tying.

HAYNES, Circuit Judge, concurring and dissenting:

Wayne Pratt received the death penalty at the hands of three police officers for the misdemeanor crime of failing to stop and give information. The majority opinion concludes that the deputies' decision to hog-tie Pratt and apply force to his back while he was in this position was a reasonable response to Pratt's failure to stop and identify himself following an accident and his failure to comply with their instructions. Qualified immunity "protect[s] police officers from the sometimes hazy border between excessive and acceptable force," *Saucier v. Katz,* 533 U.S. 194, 206 (2001) (citation omitted), but here, the border is not hazy. Qualified immunity cannot be interpreted to license officers to use deadly force under these facts. Because it was clearly established that officers in Deputies Wilks, Goldstein, and Salazar's position should not have hog-tied Pratt in the manner they did, I respectfully dissent from the portion of the majority opinion affirming the district court's grant of summary judgment on qualified immunity grounds for Deputies Wilks, Goldstein, and Salazar's alleged use of excessive force in hog-tying Pratt. I concur in the remainder of the judgment.

I

When confronting a claim of qualified immunity, a court asks two questions: (1) whether the officer in fact violated a constitutional right, and (2) whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 201–02 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The Supreme Court emphasized in *Tolan v. Cotton* that, in answering these questions, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." 134 S. Ct. 1861, 1866 (2014) (citing *Brosseau v. Haugen,* 543 U.S. 194, 195 n.2 (2004)). Rather, "a court must view the evidence

'in the light most favorable to the opposing party.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Here, plaintiff contends that Deputies Wilks, Goldstein, and Salazar violated the Fourth Amendment's prohibition on unreasonable seizures by using excessive force in detaining Pratt. "The inquiry into whether [the Fourth Amendment] right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 1865–66 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "This balancing 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Lytle v. Bexar Cty.*, 560 F.3d 404, 411 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). With respect to the "clearly established" prong of the qualified immunity analysis, "[t]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (citation omitted).

A

The majority opinion does not reach the second prong of the qualified immunity analysis because it concludes that, in the factual context of this case, the use of the hog-tie restraint was not unconstitutionally excessive or unreasonable. In particular, the majority opinion points to the fact that Pratt "ignored multiple requests and warnings" from the officers and "aggressively evaded their attempts to apprehend him, even after promising compliance." The majority opinion fails, however, to balance the officers' use of what

18

amounted to deadly force against the relatively weak interest the officers had in apprehending Pratt.

We have already concluded that the use of a hog-tie restraint in certain circumstances constitutes the use of deadly force. Deadly force has been defined as force that "carr[ies] with it a substantial risk of causing death or serious bodily harm." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)). In *Gutierrez*, we concluded that hog-tying may create a substantial risk of death or serious bodily injury when combined with drug use, positional asphyxia, and cocaine psychosis. *Id.* at 446–47. Those circumstances were present here. Although the officers did not know with certainty at the time of their encounter with Pratt that he was suffering from cocaine psychosis, they had sufficient information to lead them to suspect that he was intoxicated with some kind of unknown substance. When they first arrived at the scene, Pratt was running in circles, flailing his arms above his ahead, and claiming he was on fire, and Deputy Goldstein found a glass pipe and lighter in Pratt's hands after he was handcuffed but before he was hog-tied. Despite this evidence, Deputy Wilks placed Pratt in a hog-tie restraint, with assistance from Deputy Goldstein, while Pratt was in a prone position. Officer Salazar simultaneously kneeled on Pratt's back to restrain him, thus applying pressure that further impaired Pratt's ability to breathe. Accordingly, to justify the use of such deadly force, the officers must have had "probable cause to believe that [Pratt] pose[d] a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

19

No. 15-20080

At oral argument, the only crime that counsel for the County could identify as having been violated by Pratt was the failure to stop and give information—a misdemeanor violation under the Texas Transportation Code. *See* TEX. TRANSP. CODE § 550.022.  It is undisputed that Pratt was running around the neighborhood behaving erratically and was refusing to comply with the officers' instructions.  The officers noted that Pratt was not acting normally and appeared to be having some kind of mental or agitated episode, and they even suspected that he was intoxicated on some unknown substance.  But at no point during the encounter did any of the deputies suspect that Pratt was armed with any kind of weapon.  The only threat Pratt posed to the officers was at most a relatively mild threat of physical violence—one officer testified that Pratt turned toward an officer in an aggressive manner early in the officers' encounter with Pratt.  Additionally, Pratt kicked Deputy Goldstein in his thigh/groin area after the officers had restrained Pratt's hands and placed him on the ground.  However, at the time the officers applied the hog-tie restraint, they had been able to compel Pratt's compliance with the use of a taser and Pratt subsequently stated that he would cease resisting.  There is no indication in the record that Pratt posed an immediate threat to anyone other than the officers, no "*Manis* act" that would justify the use of deadly force.  *See Cole v. Carson*, 802 F.3d 752, 760–61 (5th Cir. 2015) ("The act justifying deadly force is sometimes called a *Manis*[1] act.  We have found qualified immunity was inappropriate due to the absence of a *Manis* act . . . ." (footnote omitted)).  Thus, there exists at least a fact dispute as to whether Pratt presented *any*

---

[1] *Manis v Lawson*, 585 F.3d 839, 844–45 (5th Cir. 2009) (Manis's act of reaching under the seat of the vehicle in what looked like a grab for a weapon was the "act" that justified the use of deadly force.).

threat of harm to the officers, much less a threat of serious physical harm at the time the officers applied the hog-tie restraint.

Recent Supreme Court cases addressing the Fourth Amendment right to be free from the use of excessive force provide guidance regarding how to conduct the balancing analysis. For example, in *Mullenix v. Luna*, 136 S. Ct. 305 (2015), the Court focused on the fact that the suspect was a "reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer," *id.* at 309. The Court held that the officers' use of deadly force in attempting to stop the suspect's high-speed car chase did not violate clearly established law. *Id.* at 312. Similarly, in *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015), the Court held that officers did not violate the Fourth Amendment in using potentially deadly force where the officers knew that the suspect "had a weapon and had threatened to use it to kill three people," the officers had unsuccessfully attempted to subdue the suspect with pepper spray, and the suspect was only a few feet from a cornered officer, *id.* at 1775. In *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), the Court held that the officers' use of deadly force did not violate the Fourth Amendment where the officers fired 15 shots in an attempt to end a car chase that had "exceeded 100 miles per hour and lasted over five minutes," during which the suspect "passed more than two dozen other vehicles, several of which were forced to alter course," concluding that the car chase "posed a grave public safety risk," *id.* at 2021. The Court emphasized that the suspect posed an actual and imminent threat to

No. 15-20080

pedestrians and other motorists, as well as to the officers involved in the chase.[2] *Id.* at 2021–22.

In each of these cases, the officers faced an immediate threat of serious harm, as did others who might come into contact with the individual in question. Conversely, in the instant case, there is no indication that Pratt ever posed a serious threat of harm to any of the officers, nor any indication that the officers feared for their safety in any meaningful way that might justify the use of deadly force. This is not the "split second" decision described in the concurring opinion. Thus, balancing Deputies Wilks, Salazar, and Goldstein's use of deadly force against the importance of the government's interests alleged to justify the intrusion leads inexorably to the conclusion that the

---

[2] Conversely, in *Tolan v. Cotton*, 134 S. Ct. 1861 (2014), the Supreme Court reversed a panel of the Fifth Circuit that had affirmed a district court's grant of summary judgment on qualified immunity grounds. The Court held that "the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* at 1863 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In *Tolan*, a police officer mistakenly accused two men of being in possession of a stolen vehicle after keying an incorrect character into the computer in his squad car. *Id.* He confronted the two men outside of the home where Tolan lived with his parents. *Id.* Tolan's parents heard the commotion and exited the front door in their pajamas, insisting that the vehicle was not stolen. *Id.* An additional officer arrived and instructed Tolan's mother to stand against the family's garage door. *Id.* at 1863–64. Tolan and his mother testified that the officer grabbed her arm and slammed her against the garage door with enough force to leave bruises on her arms and back. *Id.* at 1864. Seeing this, Tolan rose to his knees and shouted an expletive, demanding that the officer leave his mother alone. *Id.* The officer then drew his pistol and fired three shots at Tolan with no verbal warning. *Id.* The Supreme Court remanded the case to the Fifth Circuit to correctly credit Tolan's evidence and determine whether the officer's actions violated clearly established law. *Id.* at 1868. On remand, the Fifth Circuit held that a genuine dispute of material fact existed as to whether the officer was entitled to summary judgment based on qualified immunity. *Tolan v. Cotton*, 573 F. App'x 330, 330–31 (5th Cir. 2014).

deputies' alleged use of force in this case was excessive and constitutes a violation of Pratt's Fourth Amendment rights.[3]

B

With respect to the second prong of the qualified immunity analysis, viewing the facts in the light most favorable to the plaintiff, it is apparent that the officers' actions in using excessive force violated clearly established law. As of May 10, 2010, the date on which the events in this case occurred, the Fifth Circuit had decided two cases directly addressing whether the use of hog-tie restraints constitutes excessive force in violation of the Fourth Amendment: *Gutierrez* and *Hill v. Carroll Cty.*, 587 F.3d 230 (2009).

As discussed previously, in *Gutierrez*, we held that placing a "drug-affected" arrestee in a hog-tie restraint constituted excessive force where hog-tying in addition to drug use, positional asphyxia, and cocaine psychosis was present. 139 F.3d at 444, 446–47. *Gutierrez* presents nearly identical facts to the facts of this case. In *Gutierrez*, police officers approached an individual who was running in circles in the middle of a heavily trafficked intersection

---

[3] With respect to the "directly and only" element of a claim of excessive force under the Fourth Amendment, I believe plaintiff has submitted sufficient evidence to raise a question of fact regarding whether Deputies Wilks, Goldstein, and Salazar's use of the hog-tie restraint caused Pratt's death. First, no case has held that "directly and only" literally means that no other cause contributed to the death in question. Counsel for both parties conceded during oral argument that they could not find a case in which the term "only" was relied upon to preclude recovery in a situation such as the instant one, where Pratt's death allegedly resulted from multiple factors, but where the plaintiff has presented expert testimony stating that Pratt would not have died but for being hog-tied and having pressure placed on his back while in a prone position. We have explained that a plaintiff need not present evidence that a defendant's excessive use of force was the *exclusive* cause of the alleged injury—rather, "so long as the injury resulted from 'clearly excessive and objectively unreasonable' force, [the plaintiff's] claim is actionable." *Bailey v. Quiroga*, 517 F. App'x 268, 268 (5th Cir. 2013) (quoting *Mouille v. City of Live Oak*, 918 F.2d 548, 553 (5th Cir. 1990)). Here, the record indicates that the hog-tying was the last act of restraint before Pratt went into cardiac arrest and ceased breathing. The plaintiff's expert opined that, but for the prone restraint, Pratt would not have died when he did. This evidence at least creates a fact issue as to causation.

and claiming that he had been shot. *Id.* at 442–43. The officers found no bullet wounds on the individual, nor did they see anyone with a gun nearby. *Id.* at 443. The officers suspected that he was intoxicated, noting that his eyes were glassy, his gait was unsteady, and his speech was slurred. *Id.* at 442–43. The individual confirmed upon questioning that he had "shot some bad coke." *Id.* at 443. The officers called an ambulance for possible toxic ingestion overdose, but when the ambulance arrived, the individual became violent. *Id.* He kicked one of the officers in the chest and refused to get in the ambulance. *Id.* At this point, the officers placed him in a hog-tie restraint in a prone position in the backseat of a patrol car so they could transport him in the patrol car to the hospital. *Id.* Upon arriving at the hospital, the individual no longer had a pulse and was pronounced dead shortly thereafter. *Id.* We reversed summary judgment on qualified immunity grounds in favor of the officers, holding that material fact disputes existed on the question of whether the officers used reasonable force. Importantly, we found that, assuming the evidence regarding the risk of death posed by hog-tying to be true, "hog-tying in [those] circumstances would have violated law clearly established prior to November 1994." *Id.* at 447.

In *Hill v. Carroll Cty.*, we again addressed whether hog-tying constituted excessive force under the Fourth Amendment. In *Hill*, police officers responded to a fight between two women. 587 F.3d at 232. One of the women turned her attention away from the fight to tackle one of the officers, pummeling him with a flashlight. *Id.* Eventually the officer managed to handcuff the woman's wrists behind her back. *Id.* He retrieved leg restraints from his patrol car and attached them, but the woman continued to kick, twist, and otherwise resist the officers as they tried to load her into the patrol car. *Id.* The officers then placed her in a hog-tie restraint, put her in the back of the

24

patrol car, and drove her to a courthouse, where they transferred the woman to another officer's patrol car. *Id.* at 232–33. The woman was placed face down for the half-hour ride to the jail. *Id.* at 233. Upon arrival, she no longer had a pulse and was thereafter pronounced dead. *Id.* We concluded that no reasonable jury could find that the deputies used excessive force to subdue the woman. *Id.* at 234. We distinguished *Gutierrez* on the ground that in *Hill*, there was no evidence of drug abuse or drug-induced psychosis, nor was there evidence that pressure had been placed on the back of the hog-tied individual. *Id.* at 235–36. Additionally, we noted that the police were called because the woman was in a fight with another individual, and that she assaulted the officer with his own flashlight when he tried to restrain her. *Id.* at 237. Furthermore, the officers tried to put her in a squad car after restraining her hands and legs to no avail, and only then resorted to a hog-tie restraint. *Id.*[4]

The facts of this case fall squarely under the holding in *Gutierrez*.[5] Here, the officers had reason to suspect that Pratt had abused drugs based on his erratic behavior, and the presence of a glass pipe and lighter in his hands takes this from mere unexplained erratic behavior into the "on drugs" camp.[6]

---

[4] The third case involving hog-tying, *Khan v. Normand*, 683 F.3d 192 (2012), had not been decided at the time of the events at issue in this case. Accordingly, it cannot relied upon to assess what law was clearly established at the time of the dispute. That case is also distinguishable because in that case, the detainee, while resisting, reached for the officer's gun. *Id.* at 193. Under *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), our court in *Khan* reached only the second prong of the qualified immunity analysis—whether the officers' actions violated a clearly established right—and declined to address whether the officers' conduct constituted excessive force. *Khan*, 683 F.3d at 194–95.

[5] To the extent that there is any dissonance among *Gutierrez*, *Hill*, and *Khan*, we are bound by the oldest case, *Gutierrez*, under our rule of orderliness. *United States v. Broussard*, 669 F.3d 537, 554–55 (5th Cir. 2012). I thus disagree with the concurring opinion that *Khan* "binds us in assessing the state of that law in 2010." Concurrence at 1.

[6] I disagree with the concurring opinion that the drugs had to be cocaine to fall within *Gutierrez*.

Furthermore, Pratt was unarmed and posed a relatively little risk of harm to the officers despite his refusal to comply with their commands. At no point did Pratt attempt any kind of violence other than kicking at the officers while he was on the ground. Pratt never attempted to reach for the officers' weapons, nor did he pose any other threat of serious harm to the officers. Additionally, the officers did not discover that Pratt had stopped breathing until after an ambulance arrived, and the amount of time Pratt was actually hog-tied is a disputed fact. Furthermore, distinct from the facts in *Hill*, the officers did not attempt to use leg restraints before placing Pratt in a hog-tie restraint. Most importantly, unlike *Hill*, the officers here used both the hog-tie restraint and put a knee on his back, greatly impairing his ability to breathe. *See Hill*, 587 F.3d at 236.[7]

In light of the holding in *Gutierrez* and the similarities between it and the instant case, the state of the law at the time of the incident was sufficiently established to provide fair warning to Deputies Wilks, Salazar, and Goldstein that their alleged conduct violated Pratt's Fourth Amendment right to be free from the use of excessive force.

Accordingly, I respectfully dissent from Part III.A.2 of the majority opinion affirming the district court's grant of summary judgment on qualified immunity grounds with respect to the plaintiff's excessive force claim against Deputies Wilks, Goldstein, and Salazar for their use of the hog-tie restraint. I

---

[7] Indeed, the absence of drugs and vertical pressure are the reasons the *Gutierrez* study was "discounted" in *Hill*: "Dr. Werner Spitz, Hill's medical expert, also failed to provide the necessary evidence of the risks associated with four-point restraints. He relied heavily on the San Diego Study . . . [but] admitted Loggins did not exhibit evidence of drug abuse or cocaine-induced psychosis, two critical factors in the San Diego Study. He conceded his own publication on positional asphyxia observes that when deaths occurred, the arresting officers had placed pressure on the back of the hog-tied prisoner. *No vertical pressure was applied to Loggins*." *Hill,* 587 F.3d at 236 (emphasis added).

No. 15-20080

would reverse and remand as to those claims. As to plaintiff's other claims, I concur in the disposition set forth in the majority opinion.[8]

---

[8] The majority opinion disposes of plaintiff's supervisory and municipal liability claims on the ground that there are no underlying excessive force violations under the Fourth Amendment. Although, as discussed above, I would find that plaintiff has sufficiently alleged a constitutional violation with respect to Deputies Wilks, Goldstein, and Salazar's hog-tying, I concur in the ultimate judgment that her municipal liability claim based on this conduct should be dismissed. To establish a claim for municipal liability under § 1983, a plaintiff "must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Here, plaintiff has not sufficiently alleged the existence of an official policy. In fact, the record evidence shows that Harris County had a policy *against* using hog-tying as a method of restraint. Accordingly, plaintiff's municipal liability claim based on the deputies' hog-tying is appropriately dismissed.